H. F. HINSON, *Plaintiff in Error, v.* THE STATE OF FLORIDA, *Defendant in Error.*

1.  Upon the trial of a defendant for larceny of jewels from The Southern Express Company, it is not error for the court to refuse to strike the testimony of a witness for the State because he stated the name of the carrier from which the

property was alleged to be stolen to be "Southern Express Company" where it was perfectly evidence from all the facts to what carrier the witness referred.

2. Where it is shown by the evidence that certain jewelry, alleged to have been stolen was shipped from New York by Express to Jacksonville, that it reached Jacksonville in seasonable time, and is there found in the deffendant's possession, any error that may have been committed in allowing witnesses to testify from records in tracing the stages by which the jewelry reached Jacksonville in immaterial and harmless.

3. The admission of certain incompetent evidence is harmless, error, when the evidence properly admitted is conclusive of the defendant's guilt.

This case was decided by Division B.

Writ of error to the Criminal Court of Record for Duval County.

The facts in the case are stated in the opinion of the court.

*I. L. Farris* and *Bryan & Bryan,* for Plaintiff in Error;

*Park Trammell,* Attorney General, for the State.

HOCKER, J.—This case was before this court at the January term, A. D. 1910, and is reported in 59 Fla. 20, 52 South. Rep. 194. An information was filed in the Criminal Court of Record in Duval County against the plaintiff in error, Hinson, in which he was charged, in the first county, with the larceny of a bracelet of the value of $5,000 of the property of the Southern Express Company, and in the second count with having, receiving,

buying and aiding in the concealment of the same property. The date of these crimes is alleged to be the 25th of January, 1909, and the place Duval County, Florida. The defendant, Hinson, pleaded not guilty. He was tried the last time in March, 1911, and found guilty of grand larceny, and sentenced to the Penitentiary for eighteen months. This judgment is here for review on writ of error.

Before considering the assignments of error we will as briefly as possible state the facts which were established in the trial.

On the 23rd of January, 1909, Frank C. Hutchinson, an experienced jeweller, employed by Albert H. Smith & Company of New York, acting for his employers, shipped to Greenleaf & Crosby of Miami, Florida, a unique and valuable bracelet, worth, with its gems, $4,400.00. He shipped it by the Adams Express Company in a carefully prepared box, or package, and directed to Greenleaf & Crosby. The bracelet was set with four valuable diamonds and four emeralds. It is shown with reasonable certainty that this package, or box, arrived intact in Jacksonville, Florida, over the Southern Express Company, which connected with the Adams Express Company, on the 25th of January, 1909, and was there transferred in the Union Depot to the messenger of the South ern Express Company running to Miami on the same afternoon. There was no value named on the package, and the messenger did not take especial care to look it up when checked out to him, but placed it in a basket with other express packages, which were put on a truck and carried by a negro porter to the express car going to Miami. After the train started and before reaching Bayard Station, in Duval County, he checked over the packages and missed the one we have described. The

defendant, Hinson, was also an express messenger run-
ning between Jacksonville and Wilcox, and was around
the depot that afternoon when the express matter was
being checked to its proper destination. He was not
seen, however, in close proximity to this package. When
informed of the loss of the package steps were taken to re-
cover it. T. J. Watts, a special agent, or detective, of the
Southern Express Company, visited Jacksonville some
time after the loss of the package to investigate. He
saw the messengers going in and out of Jacksonville, in-
cluding the defendant, Hinson, and he says, though that
is denied by Hinson, that he told Hinson of the loss, and
described the bracelet to him, showing him a cut of it.
He says Hinson stated he had not seen or heard anything
of it, but would look out for it. In view of Hinson's
prevarications, as will hereafter be referred to, we are
not disposed to attach any importance to his denial of
what Watts said. Watts went North then, and on the
19th or 20th of March he returned to Jacksonville because
of information he had received which led him to think
Hinson knew something of the bracelet. He took out a
warrant and engaged the services of Detectives Crawford
and Cahoon. They met the train as it came in from Wil-
cox and took charge of Hinson, who, it seems, was al-
ready arrested. They proceeded to take Hinson to Super-
intendent Haile's office. On the way Hinson desired
them to stop at Butler's Saloon, which they did, and he
there undertook to deliver to his brother a small grip-
sack he carried in his hand, alleging it contained soiled
clothes. They would not permit him to thus part with
the grip, and took possession of it and proceeded to
Haile's office. They there opened the grip in his pres-
ence and found three diamond rings and a bracelet,
though not the one they were looking for. It was dis-

covered in the conversation with him that a fourth dia-
mond ring was in his wife's possession. At Watts' re-
quest he gave him an order on his wife for this ring. In
accounting for the diamond rings he said he found the
stones about a year before in Savannah, Georgia, while he
was messenger between Jacksonville and Savannah; that
he found them one morning in passing out of the depot
across the street in front of the Union Station; that he
walked over a package wrapped in tissue paper, which
contained the diamonds, a pocket knife, a scarf pin and
some other little articles, and that he did not know the
value of the diamonds until about a year after he found
them; that he turned them over to his wife, who kept
them until a few weeks before his arrest. After he
made this statement Watts and the detectives, or one of
them, went to Hinson's home in Jacksonville, gave the
order for the ring to Mrs. Hinson, which, after some de-
lay, she gave them. They then received from her the
bracelet, which was exhibited in evidence as the one which
was stolen from the Southern Express Company. They
then returned to the jail where Hinson was and told him
about getting the bracelet from his wife. They did not
mention the bracelet when he was arrested and his grip
opened, so that he had not been afforded an opportunity
to explain the possession by his wife of the bracelet. Hin-
son then stated that his first explanation was a lie; that
he thought the officers were trying "to do him." He then
said he was walking down Bay Street on the afternoon of
the 10th of January, 1909, and saw a negro boy, riding a
bicycle, drop a package. He, Hinson, picked up the
package, did not examine it, but put it in his pocket, as
he was about to leave on his run. He examined it while
he was out on his run, and found it contained the brace-
let in question with the diamond and emerald settings.

He took them home and gave them to his wife. About a month after he found them he said a lady who saw the bracelet said it was a valuable one. He had no information of its value ·before. He then carried the bracelet with him on one of his runs and pried the diamonds out with his knife, and took three of them to Hess & Slager and had them mounted. The fourth he had mounted by a Mr. Stuart. Stuart says he told Hinson the stone was worth from $100.00 to $175.00, and that Hinson said he had just paid Hess & Slager $200.00 for it. These diamonds were identified with reasonable certainty as being the same stones which were in the bracelet. In fact, it is not denied that they were the same diamonds which Hinson pried out of the bracelet which he alleged he found. The evidence establishes with reasonable certainty that the bracelet which was in evidence was the bracelet in which the diamonds were mounted before it was shipped from New York by Hutchinson. The defendant, Hinson, introduced several witnesses, his wife, sister-in-law and two or three friends, or acquaintances, to sustain his contention that he found the diamonds on Bay Street on the 10th of January, 1909. The testimony of his sister-in-law contradicts his testimony as to when he removed the diamonds from the bracelet. She says she· went with his wife across the river to a show of some kind on the 20th of January, 1909; that his wife wore the bracelet in question, and that it had no diamonds in it then. According to his statement, the diamonds were removed something like a month after the 10th of January, 1909. It is not necessary to question the veracity of this or his other witnesses when they speak of this bracelet. He had two bracelets, as one was found in his grip, and these witnesses who speak of examining the bracelet in controversy were not expert jewelers, and

might easily have mistaken one bracelet for the other. In no other way are we able to reconcile their testimony with the undisputed fact that the bracelet in question, thoroughly identified by an expert witness, intelligent and unimpeached, was shipped from New York on the 23rd of January, 1909, and did not arrive at Jacksonville until ten days after Hinson alleged he found it on Bay Street. Moreover, Watts testified that Hinson told him and the detective in his second explanation that he found the package on Bay Street on the 25th of January, 1909. Hinson admitted that he made no effort whatever to discover the owner of this valuable bracelet, with its diamonds and emeralds, worth about $4,000.00. He quietly appropriated it. He thereby admits his lack of probity and honesty, as he had already admitted his lack of veracity. When arrested he endeavored to make away with the tell-tale grip-sack, and when he discovered at the jail that his first story would not do, he was nervous and disturbed, and Watts says he appealed to him as a Knight of Pythias to help him keep the matter out of court. Linking these facts to the other facts which we have noticed, and not regarding the objectionable evidence, the jury as reasonable men might well have found beyond a reasonable doubt that Hinson's story was entirely false, and that he was guilty. In fact, we do not see how they could have arrived at any other conclusion.

The first assignment of error is based on the refusal of the court to strike the testimony of Witness Wolfely because he stated that the name of the carrier was "Southern Express Company" instead of "The Southern Express Company." It seems to us that this assignment is utterly without merit. There was abundant evidence as to the name of the carrier, which is named in the information, and everyone must have known to what carrier

the witness referred. There was an attempt on the part of the State to trace by several witnesses the various stages by which the package shipped from New York reached Jacksonville. It is alleged the witnesses testified from the evidence of records, which were not introduced, and this testimony was improperly admitted. Without examining into the questions raised, it is apparent from the testimony that the package was shipped from New York and reached Jacksonville in seasonable time, and its contents found in Hinson's possession. We think there is nothing material in these assignments.

A number of assignments are based on the admission in evidence of the conduct and statements of Hinson's wife when Watts and the detectives went there with the order for the ring. Hinson not being then present at the house. It is probable that what Mrs. Hinson said and did in connection with the delivery of the bracelet to the officers was not proper testimony. As to the ring Hinson had made his wife his agent for its delivery to the officers. But if it was all incompetent, the other evidence against him was, in our opinion, conclusive. No other errors are assigned.

In our opinion, what we have said in Hopkins v. State, 52 Fla. 39, 42 South. Rep. 52; Coatney v. State, 61 Fla. 19, 55 South. Rep. 285; Goff v. State, 60 Fla. 12, 53 South. Rep. 327, and Gee v. State, 61 Fla. 22, 54 South Rep. 458. applies to this case. Errors in the admission or rejection of evidence will not be sufficient to reverse a judgment when from the evidence properly admitted, the jury, as reasonable men, could not have arrived at a different verdict.

Judgment affirmed.

TAYLOR and PARKHILL, J. J., concur;

WHITFIELD, V. J., and SHACKLEFORD and COCKRELL, J. J., concur in the opinion.